## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

NORTHMARQ CAPITAL, L.L.C.,     )
                                  )
     Plaintiff and Counterclaim     )
     Defendant,                 )
                                  )
v.                              )     Case No. 24-cv-00073-SH
                                  )
FARHAN KABANI,             )
                                  )
     Defendant and Counterclaimant.     )

### OPINION AND ORDER

Before the Court is Northmarq's motion to dismiss all but one of Kabani's counterclaims.[1]  The Court finds Kabani has failed to plead any claim of fraud, and the fraud claims will be dismissed without prejudice with leave to amend.  Northmarq's motion is otherwise denied.

### *Background*

Taking the factual allegations in the counterclaim as true and viewing them in the light most favorable to the nonmoving party, Counterclaimant Farhan Kabani ("Kabani") alleges as follows:

### *Kabani & Four Pillars' Original Agreements*

Kabani is a loan originator who assists clients with sourcing and selecting loan options, processing and closing loans, and servicing loans after they close.  (Ctrcl. ¶ 3.[2])

---

[1] The parties have consented to the jurisdiction of a U.S. Magistrate Judge for all purposes under 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(a).  (ECF No. 18 at 4.)

[2] As the federal rules appear to require, Kabani has included his counterclaim in his first pleading, i.e., his answer to Northmarq's petition.  *See* Fed. R. Civ. P. 13(a) ("A pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim . . . arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ."); Fed. R. Civ. P. 7(a) (defining pleadings as including "an answer to a complaint").  Unfortunately, this Court's ECF filing

In 2021, he partnered with SJCO-Holdings, L.L.C. ("SJCO") to form Four Pillars Capital Markets, L.L.C. ("Four Pillars"). (*Id.* ¶ 5.) Four Pillars "provided debt and equity financing solutions" for commercial real estate investment properties. (*Id.*) In July 2021, Kabani executed a Membership Subscription Agreement, Operating Agreement, Independent Contractor Agreement, and Promissory Note, defining the scope of his relationship with Four Pillars. (*Id.* ¶¶ 6–11; *see also* ECF No. 2-1 at 8–14[3] (Independent Contractor Agreement), ECF No. 2-1 at 15–17 (Promissory Note).[4]) Under the terms of the original Promissory Note, if Four Pillars terminated Kabani without good reason and not for cause as defined in the Operating Agreement, the outstanding amounts owed under the Promissory Note would be forgiven. (Ctrcl. ¶ 12; ECF No. 2-1 at 15–16 § 2(c)(1).) Kabani then began work as a "Partner" for Four Pillars, leading a team of over a dozen loan originators, analysts, and administrative support staff. (Ctrcl. ¶ 13.) Under the Independent Contractor Agreement, Kabani earned commission and fees based upon the "Gross Fee" earned by his sales team. (*Id.* ¶ 15; ECF No. 2-1 at 9 § 4.1.)

---

instructions state, "If your [Counterclaim] contains an Answer . . . , you must divide them into separate documents and file them separately." *See* Filing Instructions – Civil, https://www.oknd.uscourts.gov/cmecf-information/filing-instructions-civil (last visited Oct. 4, 2024). As many litigants do while trying to comply with the federal rules and ECF technicalities, Kabani has filed the same document—containing both his answer and counterclaim—twice on the docket. (ECF Nos. 10–11.) The paragraphs of the counterclaim are not numbered consecutively to those of the answer, so there are, for example, multiple paragraphs "1" in the document. To avoid confusion, when referring to Kabani's answer, the Court will reference "Ans. ¶ ___," referring to the paragraphs on pages 1–6 of ECF No. 10. When referring to Kabani's counterclaims, the Court will reference "Ctrcl. ¶ ___," referring to the paragraphs on pages 8–24 of ECF No. 11.

[3] References to page numbers refer to the ECF header.

[4] "In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

**The Sale of Four Pillars to Northmarq**

In August 2022, Kabani learned that Four Pillars and SJCO would be sold to Counterclaim Defendant Northmarq Capital, L.L.C. ("Northmarq"). (Ctrcl. ¶ 16.) On August 30, 2022, Kabani signed an agreement to sell his units in Four Pillars to SJCO. (*Id.* ¶ 17.) This agreement became effective immediately prior to the closing of the securities purchase agreement between Northmarq, Four Pillars, and SJCO (the "SPA"). (*Id.*) As a result of this agreement, Kabani would cease to be a member of Four Pillars. (*Id.*) The SPA closed in mid-October 2022. (*Id.* ¶ 32.)

**Pre-Sale Negotiations Between Kabani and Northmarq**

During the period from August 2022 to the closing of the SPA, Kabani had discussions about his post-SPA role. (*Id.* ¶ 18.) Kabani "was advised by persons knowledgeable about the SPA negotiations that he would be offered a managerial role with" Northmarq. (*Id.* ¶ 19.)

On September 2, 2022, Kabani met with Jeff Erxleben, Northmarq's President of Debt & Equity ("Erxleben"). (*Id.* ¶ 20.) During that meeting, Erxleben told Kabani that, following the SPA, (1) Kabani and his team would continue to serve the Tulsa, Oklahoma market; (2) loan originators like Kabani would have to pay higher referral fees to investment sales brokers; (3) loan originators like Kabani would be paid a lower percentage, or split, of the fees collected; but (4) Kabani would receive servicing fees, that is a portion of the periodic loan payments made during the course of a mortgage, which would offset the higher referral fees. (*Id.* ¶¶ 22–25.)

Prior to the closing of the SPA, other "agents and/or apparent agents" of Northmarq told Kabani that: (1) Northmarq believed that net leases have a national

marketplace;[5] (2) Four Pillars loan originators would retain both internal and external clients; (3) Four Pillars loan originators would continue to receive support from a team that included two analysts in Chicago and a third to be hired; (4) Northmarq intended to support and maintain the existing Four Pillars team to preserve the business it generated; (5) Northmarq supported the recruitment of the new senior analyst; and (6) Northmarq did not require loan originators to work from the office. (*Id.* ¶ 26.)

Based on these representations, on September 24, 2022, Kabani executed a Second Addendum to the Independent Contractor Agreement (the "ICA Addendum") and an Addendum to the Promissory Note (the "Note Addendum") with Four Pillars.[6] (*Id.* ¶¶ 27, 29; *see also* ECF No. 11-1 (the ICA Addendum), ECF No. 2-1 at 18 (the Note Addendum).)

The ICA Addendum provided for a retention payment to Kabani and several amendments to the Independent Contractor Agreement. (ECF No. 11-1.) Following these amendments, Kabani would continue his engagement with Four Pillars "subject to the terms of" the Independent Contractor Agreement, as amended.[7] (Ctrcl. ¶ 28(a); ECF No. 11-1 at 1.) The addendum clarified a reference to the "Broker Policy Manual," but otherwise Kabani would be entitled to the same percentage of the "Gross Fee" as before— "Salesperson's remaining terms and conditions will remain consistent with Salesperson's

---

[5] "A significant portion of [Four Pillars'] deals related to net leases and were transacted on a national basis." (Ctrcl. ¶ 13.)

[6] The first addendum to the Independent Contractor Agreement occurred on September 29, 2021 (ECF No. 11-1 at 1), but there is no copy of this document in the record.

[7] Northmarq alleges that, following the merger, "all rights held by Four Pillars vested to Northmarq." (ECF No. 2-1 ¶ 8.) Kabani admits, on information and belief, "that all rights held by Four Pillars as of . . . 12:01 a.m. on December 31, 2022 vested to" Northmarq. (Ans. ¶ 8.) It also appears that Kabani bases his contract claims against Northmarq on an understanding that Northmarq has taken the place of Four Pillars for purposes of the Independent Contractor Agreement and Promissory Note, as amended. (Ctrcl. ¶¶ 80–88.)

current practices and standards in effect immediately prior to the closing of the SPA."
(Ctrcl. ¶ 28(b); ECF No. 11-1 § 2.)  The term of the Independent Contractor Agreement
was now four years from the date of the ICA Addendum, and either Four Pillars or Kabani
could terminate it at any time for any reason by providing written notice to the other
party.  (Ctrcl. ¶ 28(c); ECF No. 11-1 § 3.)

***Northmarq's Post-Sale Representation to Kabani***

Kabani alleges one purportedly fraudulent representation that occurred after he
signed the ICA and Note Addenda—"After the SPA closed, Erxleben again told Kabani he
would receive servicing fees."  (Ctrcl. ¶ 34.)  Kabani obtained business for Northmarq on
the expectation that he would receive such fees.  (*Id.* ¶ 35.)

***Four Pillars and Northmarq's Post-Sale Actions & Kabani's Resignation***

After the SPA, Kabani reported to Erxleben and Lauren Breskey, Northmarq's
Managing Director of Debt & Equity ("Breskey").  (*Id.* ¶ 33.)  "Breskey and/or Erxleben
required Kabani to work in a certain location, observe certain hours, and follow various
directives" all in "departure from the practices and standards in effect at [Four Pillars]
immediately prior" to the SPA's closing.  (*Id.* ¶ 36.)  Kabani also had to pay higher referral
fees and was given an inferior title of "Senior Vice President."  (*Id.* ¶¶ 37, 44.)  Northmarq
denied Kabani access to information available to other originators, allocated his support
staff and resources to others, and terminated certain members of his team.  (*Id.* ¶¶ 38,
48–50.)  In departure from prior Four Pillars' practices and standards, Northmarq
restricted Kabani's access to internal investment sales agents, limited him to working
smaller deals internally, and encouraged or instructed internal investment sales brokers
not to work with him.  (*Id.* ¶¶ 39–41.)  Also in departure from prior practices, Erxleben
assigned the Tulsa market to other loan originators.  (*Id.* ¶ 42.)  Finally, in departure from
prior practices, Northmarq required Kabani to work with an inferior in-house marketing

employee and forced Kabani to directly incur marketing costs.  (*Id.* ¶¶ 45–46.)  Erxleben repeatedly encouraged Kabani to leave Northmarq and, after inviting Kabani to raise his concerns, failed to address them.  (*Id.* ¶¶ 43, 47.)  In April 2023, Erxleben told Kabani he would not receive servicing fees, even though other loan originators were receiving them. (*Id.* ¶ 51.) After Kabani questioned this, Erxleben told Kabani they would not speak again, and Kabani had no more meaningful interactions with Erxleben or Bresky.  (*Id.*)  "Kabani felt compelled to resign effective September 6, 2023."  (*Id.* ¶ 52.)

## *Procedural Background*

On January 11, 2024, Northmarq sued Kabani for breach of the Promissory Note, as amended.  (ECF No. 2-1.)  Kabani has counterclaimed, asserting fraudulent inducement (Count I); fraud (Count II); fraud by failure to disclose (Count III); promissory estoppel (Count IV); breach of independent contractor agreement (Count V); "constructive discharge breach of contract" (Count VI); quantum meruit (Count VII); and unjust enrichment (Count VIII).[8]  (Ctrcl. ¶¶ 55–97.)  Northmarq seeks dismissal of all claims except Count V.  (ECF No. 13 at 5.)

## *Analysis*

### I.   **Legal Standard**

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the [pleading] alone is legally sufficient to state a claim for which relief may be granted."  *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010) (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)).

---

[8] Kabani calls each of these a "claim for relief," while Northmarq calls each a "count."  For ease of reference, the Court will call them counts.

The Court accepts all well-pleaded allegations as true and views them in the light most favorable to Kabani, the nonmoving party. *Id.*

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy Rule 8, detailed factual allegations are not required, but a plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). This is more than "labels and conclusions" or "a formulaic recitation of the elements" of the claim. *Id.* at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Determining whether a complaint contains a sufficiently plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The Rule 8 plausibility standard applies to allegations of malice, intent, knowledge, and other conditions of a person's mind under Rule 9(b). *Id.* at 686–87.

However, in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This generally requires that a plaintiff "specify the source, time, place, manner and content of the allegedly fraudulent representations, and the consequences thereof." *T.D. Williamson, Inc. v. Lincoln Elec. Automation, Inc.*, No. 21-CV-153-GKF-JFJ, 2022 WL 16842907, at *7 (N.D. Okla. Jan. 21, 2022) (citation omitted). In other words, the plaintiff must at least provide the "who, what, where, when, and how" of the alleged fraud. *Clinton v. Sec. Benefit Life Ins.*

*Co.*, 63 F.4th 1264, 1277 (10th Cir. 2023).  Rule 9(b)'s purpose is to provide fair notice of the asserted claims and the factual bases of those claims.  *George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir. 2016).  "[N]ot every allegation of fraudulent misconduct must be pleaded with particularity for a complaint to survive at the motion to dismiss stage."  *Clinton*, 63 F.4th at 1280.  The focus, instead, is on "whether the complaint, taken as a whole, sufficiently apprises the defendant of its involvement in the alleged fraudulent conduct."  *Id.* (cleaned up).

The Court will address Kabani's claims in the same order as briefed by the parties.

## II.   "Constructive Discharge Breach of Contract" (Count VI)

Northmarq has sued Kabani on the grounds that the Promissory Note, as amended, was a binding contract between it and Kabani.  (ECF No. 2-1 ¶ 28.)  According to Northmarq, Kabani terminated his engagement on September 6, 2023.  (*Id.* ¶ 29.)  Northmarq asserts that, because of this, Kabani was required to pay the outstanding amounts owed under the Promissory Note immediately.  (*Id.* ¶ 30; *see also id.* at 15 § 1 (defining "Service Period" as "the period during which such engagement [of Kabani under the Independent Contractor Agreement] remains in effect" as described in that agreement), *id.* at 16 § 2(c)(ii) ("If Payor under the Payee's Operating Agreement terminates the Service Period for any reason other than Disability, . . . the entire balance of unpaid principal and accrued interest will be due and payable by Payor on the effective date of termination of the Service Period")).

In Count VI of his counterclaim, Kabani asserts that Northmarq "made working conditions so intolerable and disadvantageous that Kabani felt compelled to resign," making Kabani's resignation "tantamount to a termination by Plaintiff without 'good reason' or 'cause,' as those terms are defined for purposes of the 'Addended Note.'" (Ctrcl. ¶¶ 85–86.)  As a result, Kabani asserts that he is entitled to forgiveness of the unpaid principal

and accrued interest.  (*Id.* ¶ 87; *see also* ECF No. 2-1 at 16 ¶ 2(c)(i).)  Kabani further argues that he is entitled to retention payments under the ICA Addendum.  (Ctrcl. ¶ 88; *see also* ECF No. 11-1 § 1.)  Kabani has labelled this claim as "Constructive Discharge Breach of Contract."  (ECF No. 11 at 21.)

In its motion, Northmarq does not dispute whether Kabani would be entitled to such loan forgiveness or payments if Northmarq terminated Kabani.  Northmarq does not even dispute whether, as a factual or legal matter, it could terminate Kabani's engagement through actions that somehow compelled Kabani to submit a resignation letter.  Instead, Northmarq attacks the label Kabani gives his claim, arguing, "There is no such claim for 'constructive discharge breach of contract' under Oklahoma law."  (ECF No. 13 at 13.)

In one respect, Northmarq is correct.  Constructive discharge is not an independent cause of action under Oklahoma law; instead, it is most notably an element of a wrongful termination action—i.e., a *Burk* tort.  *Patel v. Tulsa Pain Consultants*, 2022 OK 56, ¶ 11, 511 P.3d 1059, 1062 (explaining the elements of wrongful termination include whether an actual or constructive discharge occurred).  All parties agree that Kabani is not asserting a *Burk* tort claim.  (ECF No. 13 at 13–14; ECF No. 19 at 7.)

But breach of contract <u>is</u> an independent cause of action under Oklahoma law.  To state a claim for breach of contract, a party must allege (1) contract formation; (2) contract breach; and (3) damages directly resulting from the breach.  *Digit. Design Grp., Inc. v. Info. Builders, Inc.*, 2001 OK 21, ¶ 33, 24 P.3d 834, 843.  However titled, Kabani appears to be alleging such a claim—asserting (1) the parties formed contracts through the Promissory Note and Independent Contractor Agreement, as amended; (2) Northmarq breached these agreements by terminating Kabani without forgiving the amounts due under the Promissory Note or paying retention payments purportedly owed

9

under the Independent Contractor Agreement; and (3) Kabani was damaged by the breach.

Northmarq does not ask the Court to analyze whether Kabani has plausibly alleged that Northmarq terminated Kabani's engagement through the various actions set forth in the counterclaim. When the issue eventually comes before the Court, the undersigned will analyze the facts alleged—or the evidence presented—under the traditional rules governing the interpretation of all contracts, as applied to the language of the actual contract at issue. For now, the Court will not dismiss a breach of contract claim based merely on a header.[9]

## III.   Fraud Claims (Counts I-III)

Kabani's fraud claims are based on three distinct alleged misrepresentations: (1) Erxleben's pre-closing statement that Kabani would receive servicing fees (Ctrcl. ¶ 25); (2) other pre-closing statements made by Northmarq "agents and/or apparent agents" relating to Northmarq's treatment of Kabani and his Four Pillars team (*id.* ¶ 26); and (3) Erxleben's post-closing statement that Kabani would receive servicing fees (*id.* ¶ 34). Northmarq offers three reasons why the fraud claims should be dismissed. First, the alleged misrepresentations made by Northmarq's agents or apparent agents are not pled with sufficient particularity. (ECF No. 13 at 15–16.) Second, Erxleben's pre-closing promise of servicing fees cannot support a fraud claim, because it is not a statement of present fact and was contrary to the terms of the parties' agreement. (*Id.* at 16–20.)

---

[9]  The federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam); *see also* A. Benjamin Spencer, 5A Fed. Prac. & Proc. (Wright & Miller) § 1357 (4th ed.) ("the district court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible legal theory"); *Barrett v. Tallon*, 30 F.3d 1296, 1299 (10th Cir. 1994) (finding district court erred by failing to consider whether the complaint adequately pled a "garden variety" fraud claim).

Third, Kabani has not alleged any independent harm stemming from the fraud.  (*Id.* at 20–21.)  Northmarq also argues in passing that Erxleben's post-closing statement cannot be the basis of a fraud claim, because Kabani could not have relied on it in deciding to execute the ICA and Note Addenda.  (*Id.* at 16 n.4.)

### A.    A Note on Fraud

Oklahoma law recognizes four distinct types of "deceit"—

1. The suggestion, as a fact, of that which is not true by one who does not believe it to be true.

2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true.

3. The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,

4. A promise, made without any intention of performing.

Okla. Stat. tit. 76, § 3.  A person "who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage" he causes the other.  *Id.* § 2.  Under the federal rules, no matter which type of deceit is alleged, the claim of fraud must be pled with particularity.  Fed. R. Civ. P. 9(b).

### B.    Erxleben's Pre-Closing Statement Regarding Servicing Fees

Northmarq does not dispute that Kabani has exercised sufficient particularity in attempting to plead a fraud claim regarding Erxleben's pre-closing statement.  Neverthe-less, Northmarq argues that any fraud claims based on this statement must be dismissed, because (1) it is not a statement of present fact and (2) could not be reasonably relied upon given the language of the Independent Contactor Agreement, as amended.  (ECF No. 13 at 16–20.)  If Erxleben's pre-closing statement is one of future intent, Northmarq argues, Kabani has failed to plead Northmarq had the requisite bad intent.  (*Id.* at 17 n.5.)

### 1.     Statement of Present Fact

As noted above, Oklahoma's definition of deceit includes both statements of fact that are untrue and promises made with no intention of performing them.  No one could read—and indeed no party does read—the allegations regarding Erxleben's pre-closing statement as being anything other than a statement of future intent (a promise). [10] Therefore, the question is whether Kabani has adequately alleged that Northmarq made a promise "without any intention of performing it."

### 2.     Pleading Intent

The counterclaim alleges Erxleben represented that Kabani would receive the servicing fees, but nowhere does it allege Erxleben made this statement with the intention of not performing it.  Instead, Kabani generally alleges that, from August to October 2022, Northmarq "through its agents and/or apparent agents, made representations" that were "(1) known to [Northmarq] to be false at the time they were made, and/or (2) were made by [Northmarq] recklessly, without having knowledge as to their truth."  (Ctrcl. ¶¶ 56–57.)

Kabani argues this is sufficient, because Rule 9(b) allows him to allege malice, intent, knowledge, and other conditions of the mind "generally."  (ECF No. 19 at 13.) While he has accurately quoted Rule 9(b), Kabani is mistaken in asserting that Rule 9(b)

---

[10] Conceptually, a fraudulent promise is a statement of present fact.  As the Oklahoma Supreme Court has repeatedly noted, the error "consists in not distinguishing between the nonperformance of a promise and a promise made mala fide, and without any intention at the time of making it to perform it." *Citation Co. Realtors v. Lyon*, 1980 OK 68, ¶ 8, 610 P.2d 788, 790–91 (quoting *McLean v. Sw. Cas. Ins. Co.*, 1915 OK 987, ¶ 5, 159 P. 660, 662) (emphasis added).  "There must be a misstatement of an existing fact; but the state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained, it is as much a fact as anything else. A misrepresentation as to the state of a man's mind is therefore a misstatement of fact."  *McLean*, ¶ 5, 159 P. 660, 662 (quoting *Edginton v. Fitzmaurice*, 29 Ch. Div. 459).

allows him to offer labels and conclusions, or a formulaic recitation of the element of intent.  The Supreme Court has made clear that this "will not do" under Rule 8.  *Iqbal*, 556 U.S. at 678.  Nor is it permissible when alleging intent "generally" under Rule 9(b). *Id.* at 686–87.  "Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss."  *Id.* at 687 (dismissing for failure to plausibly allege intent).

Here, Kabani has not even stated that Erxleben made a promise to pay the servicing fees knowing Northmarq had no intention of ever paying them.  Nor has Kabani argued that other <u>facts</u> pled in the counterclaim would make such an allegation plausible.

### 3.    Reasonable Reliance

Kabani also fails to plausibly allege reliance on Erxleben's pre-closing statement.

Under the original Independent Contractor Agreement, Kabani was entitled to receive 100% of the "Gross Fee Available to Team" subject to various conditions.  (ECF No. 2-1 at 9 § 4.1.)  The "Gross Fee Available to Team" was defined as "the total fee received by Company ('Gross Fee') <u>at close</u> of each transaction, less any external referral fees or internal cooperative bonuses."  (*Id.* § 4.1(B) (emphasis added).)  "Commissions & fees become earned and payable only upon receipt by Company of Gross Fees owed to Company <u>in connection with the closing</u> of a transaction" and were paid to Kabani "on the first possible scheduled payment date after Company's receipt of all such Gross Fees . . . ." (*Id.* § 4.1(C) (emphasis added).)

Kabani alleges that, on September 2, 2022, Erxleben told him that Northmarq required loan originators like Kabani to pay higher referral fees and paid them a lower percentage of fees collected.  (Ctrcl. ¶¶ 23–24.)  However, Erxleben also told Kabani that the higher referral fees would be offset by "additional value or compensation to Kabani" in the form of the servicing fees he would receive from Northmarq.  (*Id.* ¶ 25.)  Such ser-

vicing fees are a portion of Northmarq's "servicing strips," which "refers to a percentage of periodic loan payments taken as compensation for servicing that loan during the course of a mortgage." (*Id.*)

Then, on September 24, 2022, Kabani signed the ICA Addendum purportedly in reliance on this representation. (*Id.* ¶ 27.)  The ICA Addendum stated that it constituted the entire agreement between the parties. (ECF No. 11-1 § 6.)  But the ICA Addendum explicitly stated—in a section entitled "Commissions, Expenses & Fees"—that Kabani's terms and conditions would "remain consistent" with the "current practices and standards in effect immediately prior to the closing of the SPA." (*Id.* § 2.[11])  Kabani has not pled facts making it plausible that a "Gross Fee" based on amounts received on closing a loan would include periodic servicing fees received after that closing.  Kabani does not allege that the Independent Contractor Agreement was ever interpreted in this manner before Northmarq's purchase of Four Pillars—quite the opposite, alleging that the "servicing fees represented additional value or compensation to Kabani . . . ." (Ctrcl. ¶ 25(b).)  Kabani further has not pled facts making it plausible that he reasonably relied on a representation that the terms of his compensation would change when signing a document stating that the terms of his compensation would not change.  *See Felix v. Lucent Techs., Inc.*, 387 F.3d 1146, 1164–65 (10th Cir. 2004) ("Oklahoma law requires as an element of fraud 'reasonable reliance' on misrepresentations, and . . . 'an action for fraud may not be predicated on false statements when the allegedly defrauded party could

---

[11] "**Commissions, Expenses & Fees.**  For avoidance of doubt, references to 'Broker Policy Manual' in Section 4.1.B of the Agreement shall be interpreted by, and as referring to, the Stan Johnson Company Broker Policy Manual in effect at the time of the Closing. [Kabani's] remaining terms and conditions will remain consistent with [Kabani's] current practices and standards in effect immediately prior to the closing of the SPA."

have ascertained the truth with reasonable diligence.'" (quoting *Silver v. Slusher*, 1988 OK 53, n.8, 770 P.2d 878, 882 n.8)).

Kabani has failed to state a claim of fraud based on Erxleben's pre-closing statement about servicing fees.

### C.   Erxleben's Post-Closing Statement Regarding Servicing Fees

Kabani appears to separately allege fraud based on Erxleben's post-closing statement that Kabani "would receive servicing fees." (Ctrcl. ¶ 34.) Counts I and II of the counterclaim are based on representations made before the closing of the SPA. (*See id.* ¶¶ 56, 63.) But, in Count III, Kabani specifically references the post-closing statement by Erxleben and alleges that Kabani not only signed the Note Addendum but also "provided services on behalf of [Northmarq] in reasonable reliance on the representations." (*Id.* ¶ 70 (citing ¶ 34) & ¶ 73.)

Like the pre-closing statement, Kabani has failed to plausibly allege a promise made without any intention of performing it. (*See* Section III(B)(2), *supra*.)

Kabani also fails to plead any fraud based on this statement with particularity. As Northmarq notes, this alleged misrepresentation occurred <u>after</u> Kabani signed the ICA and Note Addenda that form the basis of much of Kabani's claims. Pursuant to those agreements, Kabani agreed to continue to work for Four Pillars as a loan originator. Kabani does not allege how his actions after Erxleben's post-closing statement changed in reliance on that statement, as opposed to his obligations under the parties' contract. Kabani further does not allege when this statement occurred other than sometime after mid-October 2022 (the closing) and, presumably, before Erxleben's contrary statement in April 2023 (*id.* ¶¶ 34, 51).

Kabani has failed to state a claim of fraud based on Erxleben's post-closing statement about servicing fees.

**D.      Misrepresentations Made by Agents and/or Apparent Agents**

Finally, Kabani fails to plead a claim of fraud based on the generic reference to statements made during a two-month period by unnamed "agents and/or apparent agents" of Northmarq.

In paragraph 26 of his counterclaim, Kabani lists various representations he alleges were made by Northmarq "by and through its agents and/or apparent agents," during a period starting sometime in August of 2022 and ending sometime before the SPA's closing in mid-October 2022.  (*Id.* ¶¶ 26, 32.)  Northmarq argues these allegations fail to satisfy the particularity requirements of Rule 9(b), because they do not identify "who made these representations, when they were made (other than a generic date window), where they were made, or how they were fraudulent."  (ECF No. 13 at 16.)

As noted above, Rule 9(b) requires the counterclaimant to allege the "who, what, where, when, and how" of the alleged fraud.  *Clinton*, 63 F.4th at 1277.  It is not enough for Kabani to allege the misrepresentations were made by Northmarq's "agents and/or apparent agents."  Kabani must provide *who* made the alleged misrepresentations to him for Northmarq to receive a fair opportunity to defend itself.[12]  "If [Northmarq] is to defend itself against allegations of fraud, it must be afforded the opportunity to refute the specific claims made by specific individuals in specific circumstances."  *A. J. Plastic Prods., Inc. v. Sandretto USA, Inc.*, No. 04-2267, 2005 WL 8160315, at *2 (D. Kan. Feb. 28, 2005) (rejecting allegations that misrepresentations were made by "Defendant, Defendant and

---

[12] This is particularly true where Kabani is not even limiting the alleged statements to Northmarq's actual agents, but instead includes "apparent agents."  Apparent agency requires, among other things, conduct of Northmarq that would reasonably lead Kabani to believe that the agent was authorized to act on Northmarq's behalf.  *Sparks Bros. Drilling Co. v. Tex. Moran Expl. Co.*, 1991 OK 129, ¶ 17, 829 P.2d 951, 954.  Without knowing who the "apparent agents" are, Northmarq has no way to investigate whether its actions caused Kabani to believe the unnamed individuals were its agents.

its agents and employees, and Defendant, by and through its agents and employees"
(internal quotation marks omitted)); *see also George*, 833 F.3d at 1255–56 (finding
allegations satisfied Rule 9(b) when, *inter alia*, "the plaintiffs identify BOA employees by
name" but not when they "only generally allege that [a plaintiff] . . . made phone calls to
BOA [and] spoke with unidentified BOA employees").

Kabani also wholly fails to discuss where the alleged misrepresentations occurred.
While he attempts to rectify this in his response by noting the misrepresentations
occurred "during discussions . . . about the anticipated integration of Kabani and [Four
Pillars] into [Northmarq], post SPA" (ECF No. 19 at 10), this likewise fails to satisfy Rule
9(b). *See Shaffer v. Eden*, 209 F.R.D. 460, 463 (D. Kan. 2002) (finding alleged misrep-
resentations "made in meetings of employees" failed to meet Rule 9(b) particularity
requirement).

Similarly, although a closer call, Kabani fails to allege when the alleged misrepre-
sentations occurred.  Kabani is seemingly alleging that he had multiple conversations with
multiple agents of Northmarq.  A timeframe of August to October 2022[13] does not put
Northmarq on fair notice of the factual bases of Kabani's fraud claims, especially in light
of the deficiencies discussed above.  *ADP, Inc. v. Util. Tri-State, Inc.*, No. 06-CV-0372-
CVE-SAJ, 2006 WL 3373081, at *2 (N.D. Okla. Nov. 20, 2006) (finding "[t]he mere indi-
cation that the alleged fraud took place sometime around June 2005 is not sufficient").
*Cf. McKissick v. Gemstar-TV Guide Int'l, Inc.*, 415 F. Supp. 2d 1240, 1247 (N.D. Okla.
2005) (finding plaintiff satisfied time requirement where she alleged purported fraud
occurred "[d]uring the week of January 17th, 2000").

---

[13] In his response, Kabani asserts that these dates include "a meeting on September 22,
2022, which was a mere two days before" he executed the ICA Addendum.  (ECF No. 19
at 10.)  There is no reference to a September 22 meeting in the paragraphs Kabani cites.

In the end, the job of this Court is not to parse every single allegation of a misrepresentation. Instead, the Court must determine whether the "allegations are sufficiently particularized when '*taken as a whole*,'" to sufficiently apprise Northmarq of its involvement in the alleged fraudulent conduct. *Clinton*, 63 F.4th at 1280. Here, the Court finds that Kabani's allegations are insufficiently particular on multiple fronts and deprive Northmarq of any reasonable ability to identify the fraudulent statements on which it is being sued.[14] Kabani's fraud claims will be dismissed.

## IV.    Equitable Claims (Counts IV, VII, VIII)

Kabani has plausibly alleged equitable claims. Northmarq argues Kabani's claims of unjust enrichment, promissory estoppel, and quantum meruit must be dismissed, because Kabani has pled the existence of a contract and is seeking relief under the contract. (ECF No. 13 at 21–24.) The Court disagrees.

Kabani alternatively pleads the existence and the non-existence of the contracts. Kabani alleges that he was fraudulently induced to enter into the ICA and Note Addenda. (Ctrcl. ¶¶ 55–61.) Fraudulent inducement is a basis for rescission of a contract and a defense to its breach.[15] *See, e.g.*, Okla. Stat. tit. 15, § 233(1); *First Nat. Bank v. Honey Creek Ent. Corp.*, 2002 OK 11, ¶¶ 13–15, 54 P.3d 100, 104–05 (upholding verdict on contract claim based on defense of fraudulent inducement). Kabani also asserts that—

---

[14] This ruling applies equally to all of Kabani's fraud claims, including those for failure to disclose. As Kabani acknowledges in his response brief, his failure-to-disclose claim is based on Northmarq's purported "failure to correct its own prior misrepresentations regarding the terms and conditions of its relationship with Kabani at any time following their making." (ECF No. 19 at 11 n.4.) The failure to adequately plead the misrepresentations equally taints allegations based on the failure to correct those misrepresentations.

[15] Kabani has asserted fraudulent inducement as one of his affirmative defenses to Northmarq's contract claim on the Promissory Note. (ECF No. 10 at 6 ¶ 6.)

"[t]o the extent that the amended Independent Contractor Agreement is an enforceable contract," Northmarq breached it.  (Ctrcl. ¶ 81.)

Federal procedural law allows for the pleading of alternative or inconsistent claims, Fed. R. Civ. P. 8(d), and Oklahoma substantive law allows for alternative remedies, as long as double recovery is avoided, *N.C. Corff P'ship, Ltd. v. OXY USA, Inc.*, 1996 OK CIV APP 92, ¶ 24, 929 P.2d 288, 295.  Quasi-contractual remedies, however, are unavailable "when an enforceable express contract regulates the relations of the parties with respect to the disputed issue." *Member Servs. Life Ins. Co. v. Am. Nat'l Bank & Trust Co.*, 130 F.3d 950, 957 (10th Cir. 1997) (describing this principle as a "hornbook rule"); *see also Krug v. Helmerich & Payne, Inc.*, 2013 OK 104, ¶ 34, 320 P.3d 1012, 1022 (stating, in context of constructive fraud and unjust enrichment, "The long-standing rule in Oklahoma is that a plaintiff may not pursue an equitable remedy when the plaintiff has an adequate remedy at law.").

This district has dismissed equitable claims where it was undisputed that an express contract governed the dispute, but it has allowed such claims to be alternatively pled where the contract's validity or applicability is disputed.  *See Brown v. Kruger Fam. Holdings II, LLC*, No. 19-CV-00048-GKF-JFJ, 2019 WL 4061677, at *5–6 (N.D. Okla. Aug. 28, 2019) (explaining when it is appropriate to plead an equitable claim as an alternative to breach of contract); *see also Horton v. Bank of Am., N.A.*, 189 F. Supp. 3d 1286, 1290 (N.D. Okla. 2016) (granting defendant judgment on the pleadings on unjust enrichment claim where validity or applicability of contract was not contested); *Baker Hughes Oilfield Operations, LLC v. Iron Hawk Energy Grp. Joint Venture*, No. 17-CV-00652-GKF-JFJ, 2018 WL 3298072, *1–3 (N.D. Okla. June 13, 2018) (refusing to dismiss unjust enrichment and promissory estoppel claims where defendants disputed applicability and validity of agreements).

Quantum meruit, meanwhile, is not completely precluded by the existence of an express contract, "as long as it involves obligations outside the scope of the express contract." *BB&B Const., Inc. v. Hogan*, 17 F. App'x 850, 851–52 (10th Cir. 2001) (unpublished) (applying Oklahoma law);[16] *see also McCurdy Grp. v. Am. Biomedical Grp., Inc.*, 9 F. App'x 822, 827 (10th Cir. 2001) (applying Oklahoma law and finding district court did not err in instructing jury on quantum meruit despite existence of contract);[17] *Schwob Energy Servs., LLC v. Matrix PDM Eng'g, Inc.*, No. 22-CV-00084-GKF-SH, 2022 WL 19976462, at *1–2 (N.D. Okla. May 4, 2022) (applying the principles noted in *Brown* to dismiss quantum meruit claim).

Here, there is a dispute as to the enforceability of the underlying contracts. Kabani can plead alternative theories; and his claims for unjust enrichment, promissory estoppel, and quantum meruit do not warrant dismissal.

## V.      Leave to Amend

Kabani requests leave to amend.  (ECF No. 19 at 7 & n.1.)  Where a party so requests, such leave should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  This is because "[t]he purpose of the Rule is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (internal quotations omitted).  Denial of leave to amend may be appropriate in instances of undue delay, bad faith or dilatory motive, repeated failures to cure deficiencies by amendments previously

---

[16] Unpublished decisions are not precedential, but they may be cited for their persuasive value. 10th Cir. R. 32.1(A).

[17] Northmarq cites *McCurdy* for the proposition that "[s]ome jurisdictions" recognize this principle—conveniently omitting that the Tenth Circuit panel found <u>Oklahoma</u> would be one of those jurisdictions.  (ECF No. 13 at 23 n.8.)  Such gamesmanship is noted and unappreciated.

allowed, undue prejudice to the opposing party, or futility of amendment. *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Granting leave to amend "is within the discretion of the trial court." *Id.* (internal quotations omitted).

Northmarq has not opposed Kabani's request for leave to amend, and the Court finds leave should be granted.  The Court grants Kabani leave to amend.

IT IS THEREFORE ORDERED that *Plaintiff's Motion to Dismiss* (ECF No. 13) is GRANTED IN PART and DENIED IN PART.  Kabani's fraud claims, as set forth in Counts I through III of his counterclaim, are DISMISSED WITHOUT PREJUDICE.  Northmarq's motion is denied in all other respects.

IT IS FURTHER ORDERED that Kabani may file an amended counterclaim by October 23, 2024.

ORDERED this 10th day of October, 2024.

SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT