IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| NORTHMARQ CAPITAL, L.L.C., | ) |
|     Plaintiff and Counterclaim Defendant, | ) |
| v. | ) Case No. 24-cv-00073-SH |
| FARHAN KABANI, | ) |
|     Defendant and Counterclaimant. | ) |

**OPINION AND ORDER**

Before the Court is Northmarq's motion to dismiss Kabani's amended counterclaims.[1] Kabani has cured the pleading deficiencies noted in the Court's prior order and has otherwise adequately pled his claims of fraud. Northmarq's motion will be denied.

### *Background*

Taking the factual allegations in the amended counterclaim (ECF No. 30) as true and viewing them in the light most favorable to the nonmoving party, Counterclaimant Farhan Kabani ("Kabani") alleges as follows:

### *Loan Originator Background & Creation of Four Pillars*

Kabani has worked as a loan originator for over 15 years. (*Id.* ¶ 3.) Loan originators assist clients with sourcing and selecting loan options, processing and closing loans, and servicing loans after they close. (*Id.*) They receive compensation through origination fees, processing fees, premiums, rebates, consulting fees, underwriting fees, subservicing strips, and servicing fees. (*Id.* ¶ 4.) Servicing fees are determined at closing and factored

---

[1] The parties have consented to the jurisdiction of a U.S. Magistrate Judge for all purposes under 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(a). (ECF No. 18 at 4.)

into a loan's interest rate based on predetermined rate spreads with respective lenders. (*Id.*) Gross servicing fees can be earned for any type of transaction, recapitalization, refinancing, acquisition, etc. (*Id.*)

In 2021, Kabani partnered with SJCO-Holdings, L.L.C. ("SJCO") to form Four Pillars Capital Markets, L.L.C. ("Four Pillars"), which "provided debt and equity financing solutions" for commercial real estate investment properties. (*Id.* ¶ 6.) Four Pillars was created with the expectation that its loan originators would work to secure loan servicing fees. (*Id.* ¶ 7.) That July, Kabani executed a Membership Subscription Agreement, Operating Agreement, Independent Contractor Agreement ("ICA"), and Promissory Note, defining the scope of his relationship with Four Pillars. (*Id.* ¶¶ 8–14; *see also* ECF No. 2-1 at 8–14[2] (ICA), ECF No. 2-1 at 15–17 (Promissory Note).[3])

Under the Promissory Note, if Four Pillars terminated Kabani without "good reason" and not "for cause" as defined in the Operating Agreement, the outstanding amounts owed under the Promissory Note would be forgiven. (ECF No. 30 ¶ 14; ECF No. 2-1 at 15–16 § 2(c)(i).) Under the ICA, Kabani earned commissions and fees based upon the "Gross Fee" earned by his sales team. (ECF No. 30 ¶ 17; ECF No. 2-1 at 9 § 4.1.) That is, Kabani would receive a split of the "Gross Fee Available to Team," which consisted of "the total fee received by [Four Pillars] ('Gross Fee') at the close of each transaction, less any external referral fees or internal cooperative bonuses." (ECF No. 2-1 at 9 4.1(A)–(B).) While working for Four Pillars, Kabani "regularly received" compensation in the form of

---

[2] References to page numbers refer to the ECF header.

[3] "In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002). Here, therefore, the Court considers documents referred to in Kabani's counterclaim where those documents are central to his claims and the parties do not dispute their authenticity.

processing fees, premiums, rebates, referral fees, and consulting fees. (ECF No. 30 ¶ 18.) On one occasion, Kabani received compensation for loan servicing. (*Id.* ¶ 19.) Kabani and Four Pillars understood the ICA to allow these kinds of compensation. (*Id.* ¶ 20.)

***Northmarq Purchases Four Pillars***

Kabani and SJCO anticipated Four Pillars could be sold to a third party. (*Id.* ¶ 22.) The Four Pillars Operating Agreement contemplated a scenario where a purchaser acquiring units from SJCO "requests that the Selling Member sign an agreement pursuant to which the Selling Member will continue to perform services for the purchaser(s), which are substantially similar to the services which" he was performing prior to the sale "and with such services to be performed on terms no less favorable than the Selling Member was performing" prior to the sale. (*Id.* ¶¶ 22–23.)

In August 2022, Kabani learned Four Pillars and SJCO were negotiating a potential sale to Counterclaim Defendant Northmarq Capital, L.L.C. ("Northmarq"). (*Id.* ¶ 21.) On August 30, 2022, Kabani agreed to sell his units in Four Pillars to SJCO. (*Id.* ¶ 22.) This agreement became effective immediately prior to the closing of the securities purchase agreement between Northmarq, Four Pillars, and SJCO (the "SPA"). (*Id.*) From this agreement, Kabani would cease to be a member of Four Pillars. (*Id.*) The SPA closed in mid-October 2022. (*Id.* ¶ 49.)

***Pre-Sale Negotiations Between Kabani & Northmarq***

From August 2022 to the closing of the SPA, Kabani had numerous discussions with Josh Campbell, former SJCO Managing Partner, about the integration of Kabani and Four Pillars post-SPA. (*Id.* ¶ 24.) Kabani alleges he would relay specific questions to Campbell. (*Id.* ¶ 26.) In turn, Campbell would discuss these questions with Northmarq representatives Travis Krueger, Chief Operating Officer, and Jeff Erxleben, President of Debt & Equity. (*Id.* ¶¶ 25, 27.) Both Krueger and Erxleben authorized Campbell to

3

provide their answers back to Kabani, and both anticipated Campbell would do so. (*Id.* ¶ 28.) In late July or early August 2022, Krueger, through Campbell, advised Kabani that Kabani would be offered a managerial role with the company. (*Id.* at ¶ 29 ("Kabani was advised by Campbell that Krueger had advised Campbell via text message that . . . .").)

Northmarq helped create a draft Second Addendum to the ICA (the "ICA Addendum"), and the draft was provided to Kabani on September 1, 2022. (ECF No. 30 ¶¶ 30–31.) That same day, Erxleben e-mailed Kabani a list of meeting topics based on questions Kabani had sent him via Campbell. (*Id.* ¶ 32.) These topics were (1) Kabani's role in Dallas, (2) growth plans for his business, (3) officing and current NM team, (4) reporting lines for other Four Pillars debt professionals, (5) agency access and other capital sources available, (6) participation in servicing strips, (7) support staff plans post-acquisition, and (8) working with investment sales. (*Id.*)

On September 2, 2022, Erxleben and Kabani met. (*Id.* ¶ 32.) Kabani explained to Erxleben his current role as a "Partner" at Four Pillars and how his team conducted business. (*Id.* ¶ 33.) Erxleben told Kabani that, post-SPA, Kabani would continue to be able to conduct his business and would have the support from Northmarq to do so. (*Id.*) Erxleben then explained that Northmarq loan originators are required to pay higher referral fees to investment sales brokers and are paid a lower percentage, or split, of the fees collected. (*Id.* ¶¶ 35–36.) To offset these additional burdens, Erxleben told Kabani that he, like other Northmarq loan originators, would receive servicing fees—*i.e.,* a portion of the periodic loan payments made during a mortgage that are locked into the rate at loan closing. (*Id.* ¶ 37.)

Kabani alleges this was not the first time Northmarq represented that its loan originators receive servicing fees. (*Id.* ¶ 39.) In August 2022, Kabani received a copy of a June 2022 PowerPoint presentation created by Northmarq that "addressed the

proposed SPA and stated that Northmarq's 'unique platform offers commercial real estate investors easy access to experts in debt, equity, investment sales, and loan servicing . . . .'" (*Id.* ¶ 39(a).)  The PowerPoint also provided financial information for Northmarq's year-to-date "Originated mortgage servicing." (*Id.*)  Also in August 2022, Kabani received a copy of a FAQ document prepared by Northmarq that identified it as a "full-service company skilled in . . . loan servicing for all commercial property types" that had a "loan servicing portfolio of nearly $70 billion." (*Id.* ¶ 39(b).)  Northmarq created and provided these materials to Kabani and others to encourage them to continue to provide services to Northmarq following the closing of the SPA. (*Id.* ¶ 39.)

On September 6, 2022, Erxleben and Campbell had a discussion regarding Kabani, during which Erxleben stated: (1) Northmarq believed net leases have a national marketplace;[4] (2) Four Pillars loan originators would retain both internal and external clients; (3) Four Pillars loan originators can work with their lenders, regardless of where that lender is located; (4) Four Pillars loan originators would continue to receive assistance from their support team; (5) Northmarq intended to support and maintain the existing Four Pillars team; (6) Northmarq supported the recruitment of a Four Pillars senior analyst; and (7) Northmarq did not require loan originators to work from the office. (*Id.* ¶ 40.)  Erxleben then e-mailed Campbell additional information regarding the Four Pillars team and their continuing client relationships. (*Id.*)  Erxleben authorized and intended for Campbell to share this information with Kabani, and Campbell did so via email on September 6, 2022. (*Id.* ¶ 41.)

---

[4] "A significant portion of [Four Pillars'] deals related to net leases and were transacted on a national basis." (ECF No. 30 ¶ 15.)

In reliance of these representations, on September 24, 2022, Kabani executed the ICA Addendum and an Addendum to the Promissory Note (the "Note Addendum"). (*Id.* ¶¶ 42, 46; *see also* ECF No. 30-1 (the ICA Addendum), ECF No. 2-1 at 18 (the Note Addendum).)

The ICA Addendum provided for a retention payment to Kabani, made several amendments to the original ICA,[5] and clarified a reference to the "Broker Policy Manual." (ECF No. 30-1). Otherwise, Kabani was entitled to the same percentage of the "Gross Fee" as before—"Salesperson's remaining terms and conditions will remain consistent with Salesperson's current practices and standards in effect immediately prior to the closing of the SPA." (*Id.* § 2; *see also id.* at 1 (explaining Kabani "shall continue [his] engagement with [Four Pillars] subject to the terms of the [ICA], as amended herein").)

***Northmarq's Post-SPA Actions & Kabani's Resignation***

After the SPA closed, Kabani worked to obtain loan servicing business for Northmarq with the expectation that he would receive servicing fees.[6] (*Id.* ¶ 52.) However, Northmarq "required Kabani to work in a certain location, observe certain hours, and follow various directives" all in "departure from the practices and standards in effect at [Four Pillars] immediately prior" to the SPA's closing. (*Id.* ¶ 53.) Kabani was given the title of "Senior Vice President," which was typically assigned to less accomplished originators. (*Id.* ¶ 61.) Northmarq denied Kabani access to business information available to other originators, allocated his support staff and resources to others, and terminated a

---

[5] For instance, the term of the ICA was now four years from the date of the addendum, and either Four Pillars or Kabani could terminate it at any time for any reason by providing written notice to the other party. (ECF No. 30 ¶ 45(c); ECF No. 30-1 § 3.)

[6] Kabani also alleges that, after the SPA closed, "Erxleben again told Kabani that he would receive servicing fees." (ECF No. 30 ¶ 51.) Kabani does not allege fraud based on this representation.

member of his team. (*Id.* ¶¶ 55, 65–66.) In departure from prior Four Pillars' practices and standards, Northmarq required Kabani to pay higher referral fees to investment sales agents; limited him to working smaller deals; encouraged or instructed internal sales brokers not to work with him; assigned the Tulsa market to other loan originators; required Kabani to work with an inferior in-house marketing employee; and forced Kabani to directly incur marketing costs. (*Id.* ¶¶ 54, 56–59, 62–63.)

When Kabani notified Erxleben of these issues, Erxleben failed to address Kabani's concerns and encouraged Kabani to leave Northmarq. (*Id.* ¶¶ 60, 64.) During a phone call on April 20, 2023, Erxleben repeatedly told Kabani he would not receive servicing fees, because the agreement he signed did not contemplate servicing fees. (*Id.* ¶ 68.) While providing services to Northmarq, Kabani received origination fees, processing fees, consulting fees, and referral fees but not servicing fees. (*Id.* ¶¶ 69–71.) Northmarq paid servicing fees to other originators during this time, including one who worked with Four Pillars pre-SPA. (*Id.* ¶ 72.) This originator had an agreement that, like the original ICA, provided for the payment of commissions and fees based upon a "Gross Fee." (*Id.*) Kabani resigned from Northmarq effective September 6, 2023. (*Id.* ¶ 73.)

### *Procedural Background*

On January 11, 2024, Northmarq sued Kabani for breach of the Promissory Note, as amended. (ECF No. 2-1.) Kabani counterclaimed, asserting various forms of fraud, promissory estoppel, breach of contract, quantum meruit, and unjust enrichment. (ECF No. 11 ¶¶ 55–97.) Northmarq filed a motion to dismiss on March 21, 2024, seeking dismissal of all but one of Kabani's claims. (ECF No. 13.) On October 10, 2024, the Court granted the motion in part, dismissing Kabani's fraud claims but granting leave to amend. (ECF No. 29.) Kabani's amended counterclaim was filed on October 23, 2024. (ECF No.

7

30.) Northmarq filed a second motion to dismiss, this time seeking dismissal of only the fraud counterclaims. (ECF No. 31.)

*Analysis*

I.     **Legal Standard & Elements**

Northmarq moves to dismiss Kabani's fraud claims for failure to state a plausible claim for relief.[7] *See Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1280 (10th Cir. 2023) (applying plausibility requirements in a fraud case). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the [pleading] alone is legally sufficient to state a claim for which relief may be granted." *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010) (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)). The Court accepts all well-pleaded allegations as true and views them in the light most favorable to Kabani, the nonmoving party. *Id.*

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy Rule 8, detailed factual allegations are not required, but a plaintiff must provide

---

[7] For the first time in its reply brief, Northmarq raises the issue of particularity under Fed. R. Civ. P. 9(b). (ECF No. 38 at 3, 5 n.5, 9.) The Court will not countenance these arguments, raised for the first time on reply. *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("arguments raised for the first time in reply are generally deemed waived"). In any event, Rule 9(b) requires that, "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This requires the plaintiff to "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1254 (10th Cir. 2016) (citation omitted). The goal is to "sufficiently apprise the defendant of its involvement in the alleged fraudulent conduct." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1280 (10th Cir. 2023) (cleaned up). Northmarq does not fault the particularity of the allegations as to the circumstances constituting fraud, and the Court finds Kabani has met its requirements under Rule 9(b).

8

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). This is more than "labels and conclusions" or "a formulaic recitation of the elements" of the claim. *Id.* at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013) (noting that all such reasonable inferences are resolved in the plaintiff's favor). This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Determining whether a complaint contains a sufficiently plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The Rule 8 plausibility standard applies to conclusory allegations of malice, intent, knowledge, and other conditions of a person's mind. *Id.* at 686–87.

The elements of common law fraud in Oklahoma are (1) a false material misrepresentation; (2) made as a positive assertion that is either known to be false, or made recklessly without knowledge of the truth; (3) with the intention that it be acted upon; and (4) which is relied upon by the plaintiff to his detriment.[8] *Gay v. Akin*, 1988 OK 150, ¶ 7, 766 P.2d 985, 989. "Oklahoma follows the view that fraud can be predicated upon a promise to do a thing in the future when the intent of the promisor is otherwise." *State ex rel. Sw. Bell Tel. Co. v. Brown*, 1974 OK 19, ¶ 20, 519 P.2d 491, 495.

---

[8] "Like other fraud-based actions, a claim for fraudulent inducement must allege all the elements of common law fraud." *Oak Tree Partners, LLC v. Williams*, 2020 OK CIV APP 5, ¶ 87, 458 P.3d 626, 646.

Fraud can also be based on silence. For example, "[i]f on account of peculiar circumstances there is a positive duty on the part of one of the parties . . . to speak, and he remains silent to his benefit and to the detriment of the other party, the failure to speak constitutes fraud." *Hubbard v. Bryson*, 1970 OK 140, ¶ 26, 474 P.2d 407, 410. Such duty to speak may arise under Oklahoma law if a party selectively discloses facts that create a false impression, or it may arise from a partial disclosure. *Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1181 (10th Cir. 2008) (noting that, for constructive fraud at least, there is no requirement that the defendant acted with intent to deceive).

## II. Fraud Claims

Kabani's first two counts (fraudulent inducement and fraud) are based on two categories of alleged pre-closing misrepresentations: (1) Northmarq's representation that Kabani would receive servicing fees following the SPA—including Erxleben's explicit statement to this effect (ECF No. 30 ¶ 37) and documents Northmarq provided Kabani in August 2022 regarding its business, including the value of originated mortgage servicing (*id.* ¶ 39); and (2) Northmarq's representation as to various post-SPA work conditions—which Kabani bases on information Erxleben provided to Campbell and authorized Campbell to share with Kabani (*id.* ¶¶ 40–41). (*See, e.g., id.* ¶¶ 77, 86, 96, 105.) In his third count, Kabani claims fraud by failure to disclose based on the first category of representations, asserting Northmarq failed to disclose "that Northmarq required certain contractual language in order to receive payment of servicing fees." (*Id.* ¶¶ 115-16.)

Northmarq provides various reasons why the fraud claims warrant dismissal: (1) Kabani fails plausibly to allege that Northmarq promised the servicing fees without the intention to perform (ECF no. 31 at 15–17); (2) Kabani could not rely on Erxleben's statement that servicing fees would be paid, because it was contrary to the terms of the ICA Addendum (*id.* at 17–20); (3) Kabani could not rely on the August 2022 documents

10

as a promise to pay servicing fees (*id.* 20–21); (4) Kabani cannot assert a fraud claim based on the statements Erxleben authorized Campbell to share, because he has not alleged facts showing Campbell—an SJCO Managing Partner—was an actual or apparent agent of Northmarq (*id.* at 21–23); and (5) Kabani has not alleged any independent harm stemming from the fraud (*id.* at 23–24).

The Court rejects each of these arguments.

### A. Plaintiff Has Stated a Plausible Claim of Fraud Based on Erxleben's Statement that Kabani Would Receive Servicing Fees

Kabani has sufficiently alleged fraud claims against Northmarq relating to servicing fees. For purposes of the current motion, the parties do not dispute that Erxleben, acting as Northmarq's agent, represented that Kabani would receive such fees. The only dispute is whether Northmarq made the statement without the intention to perform it and whether Kabani could rely on that statement to his detriment.

#### 1. Kabani Has Adequately Pled Intent

Kabani explicitly alleges that "Northmarq and/or Erxleben did not intend to provide Kabani with servicing fees at the time" the representation was made. (ECF No. 30 ¶ 82.) "But the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context." *Iqbal*, 556 U.S. at 686. Accordingly, the question before the Court is whether Kabani has alleged "enough facts that plausibly suggest that the defendant's promise to perform . . . was accompanied by an intent not to do so." *See Allianz Life Ins. Co. of NA v. Muse*, No. CIV-17-1361, 2018 WL 11219438, at *11 (W.D. Okla. June 25, 2018) (citation and internal quotation marks omitted).

Kabani has met this burden. Kabani has pled additional facts that make his conclusion *plausible—i.e.,* Kabani has alleged: (1) Erxleben had no knowledge of the terms of the original ICA when he made this representation, but Northmarq knew the terms of,

and helped draft, the ICA Addendum (*id.* ¶¶ 30–31, 38); (2) the same day that Kabani was provided a draft of the ICA Addendum, Erxleben sent Kabani an agenda for their meeting that included various topics relating to questions Kabani had raised about his future role at Northmarq (*id.* ¶¶ 26, 30–32); (3) these topics included growth plans for Kabani's business and participation in servicing strips (*id.* ¶ 32); (4) at the meeting Erxleben and Kabani discussed how Kabani's business was currently conducted and how it would be conducted after Northmarq took over (*id.* ¶ 33–37); (5) this included a discussion that, while Northmarq originators paid higher referral fees, they were also paid servicing fees; that Kabani would receive such fees; and this would offset against the higher referral fees (*id.* ¶¶ 35–37); (6) Erxleben reiterated post-closing that Kabani would receive servicing fees (*id.* ¶ 51); (7) Northmarq paid servicing fees to another Four Pillars originator who had a similar agreement to Kabani's (*id.* ¶ 72); and (8) Erxleben later told Kabani he would not receive servicing fees because his contract did not account for them (*id.* ¶ 68). Kabani can bring fraud claims based on this representation.

###    2.    Reasonable Reliance

Kabani alleges that he relied on this, and other representations, in executing the ICA Addendum on September 24, 2022. (ECF No. 30 ¶ 42.) Northmarq argues this reliance was unreasonable as a matter of law, because neither the original ICA nor the ICA Addendum expressly provided for servicing fees. (ECF No. 31 at 17–20.) *See Felix v. Lucent Techs., Inc.*, 387 F.3d 1146, 1164–65 (10th Cir. 2004) ("Oklahoma law requires as an element of fraud 'reasonable reliance' on misrepresentations, and . . . 'an action for fraud may not be predicated on false statements when the allegedly defrauded party could have ascertained the truth with reasonable diligence.'" (quoting *Silver v. Slusher*, 1988 OK 53, n.8, 770 P.2d 878, 881 n.8).)

Under the original ICA, Kabani was entitled to receive compensation based on the "Gross Fee Available to Team," which was defined as "the total fee received by Company ('Gross Fee') <u>at close</u> of each transaction, less any external referral fees or internal cooperative bonuses." (ECF No. 2-1 at 9 § 4.1(B) (emphasis added).) "Commissions & fees [became] earned and payable only upon receipt by Company of Gross Fees owed to Company <u>in connection with the closing of a transaction</u>" and were paid to Kabani "on the first possible scheduled payment date after Company's receipt of all such Gross Fees . . . ." (*Id.* § 4.1(C) (emphasis added).)

Kabani then signed the ICA Addendum in reliance on Erxleben's promise of servicing fees. (ECF No. 30 ¶ 42.) In the "Commissions, Expenses, and Fees" section, the ICA Addendum stated Kabani's terms and conditions would "remain consistent" with the "current practices and standards in effect immediately prior to the closing of the SPA." (ECF No. 30-1 § 2.) The ICA Addendum also stated that it constituted the entire agreement between the parties, but did <u>not</u>—as Northmarq now asserts—"disclaim[]" all prior representations of the parties.[9] (ECF No. 31 at 11 & 20 n.3.)

The Court further has not—as Northmarq now asserts—"stated in no uncertain terms that 'Erxleben's pre-closing promise of servicing fees cannot support a fraud claim because it is not a statement of present fact and was ***contrary to the terms of the parties' agreement.***" (ECF No. 38 at 6 (citing ECF No. 29 at 10); *see also* ECF No. 31 at 19.) The language Northmarq quotes is not a ruling of the Court, but a recitation of <u>Northmarq's</u> arguments. (ECF No. 29 at 10–11 ("Northmarq offers three reasons why the fraud claims should be dismissed. First, . . . . Second, Erxleben's pre-closing promise of

---

[9] Instead, the ICA Addendum contains a sentence fragment reading, "All previous discussions, promises, representations and understandings between the parties relative to the subject matter of this Addendum and the Agreement." (ECF No. 30-1 § 6.)

13

servicing fees cannot support a fraud claim, because . . . . Third, . . . .").) Indeed, the Court explicitly rejected Northmarq's "present fact" arguments. (*See id.* at 12 & n.10.) As for the terms of the parties' agreement, the Court addressed this in the discussion on reliance. (*Id.* at 13–15.)

In that discussion, the Court previously found Kabani failed to allege reliance in the original counterclaim, when Kabani did not "allege that the Independent Contractor Agreement was ever interpreted in this manner before Northmarq's purchase of Four Pillars" and instead alleged that the servicing fees were an "additional value or compensation" to him. (ECF No. 29 at 14.) As such the Court found Kabani could not plead reliance on a representation that his compensation would change, while signing a document stating that his compensation would <u>not</u> change. (*Id.*)

In the amended counterclaim, Kabani alleges he and SJCO intended Four Pillars to secure loan servicing fees, and Kabani and Four Pillars understood the original ICA as allowing Kabani to receive such fees. (*See* ECF No. 30 ¶¶ 7, 19–20.) Kabani alleges he actually received loan servicing fees while working for Four Pillars. (*Id.* ¶ 19.) Kabani further alleges servicing fees are factored into the rate at closing, and gross servicing fees are determined at the time of closing. (*Id.* ¶¶ 4, 37.) The amended counterclaim also places the representations regarding servicing fees in context, with Northmarq providing materials regarding its loan servicing business and the large value of that business.[10] (*Id.*

---

[10] Northmarq tries to separate these materials from the other representations and argues that no reasonable person would rely on them as a promise to pay servicing fees. (ECF No. 31 at 20–21.) Kabani, however, argues they should be considered alongside Erxleben's explicit representation. (ECF No. 37 at 16–17.) The Court has found that Kabani adequately alleges reliance on Northmarq's representation that he would receive servicing fees, in part due to these background circumstances. There is no need for the Court to determine whether these documents, standing alone, constitute a fraudulent representation.

¶ 39.) In these circumstances, it is a reasonable inference that Northmarq's statement that "servicing fees would offset against the higher referral fees" referred to the larger availability of such fees to originators based on the nature of Northmarq's business—and not simply that it was referring to a new form of compensation never contemplated in the original ICA.[11]  Kabani's allegations make it plausible that he relied on the representation that he would receive servicing fees, which was not inconsistent with the "practices and standards in effect immediately prior to the closing of the SPA." (ECF No. 30-1 § 2.)

### B.  Plaintiff Has Stated a Plausible Claim of Fraud Based on Statements Regarding Post-SPA Working Conditions

Kabani has sufficiently alleged fraud claims against Northmarq relating to working conditions.  For purposes of the current motion, the parties do not dispute that Erxleben and Krueger, acting as Northmarq's agents, provided various pieces of information to Campbell, an SJCO Managing Partner; that Northmarq intended and authorized Campbell to provide this information to Kabani;[12] and that Campbell provided the information to Kabani. (*E.g.*, ECF No. 30 at ¶¶ 28–29, 40–41.)  Northmarq does not argue that this information was immaterial or not a false representation.

Instead, Northmarq argues that Kabani has not adequately alleged "Campbell was acting as an agent or apparent agent of Northmarq or that Erxleben knew these alleged

---

[11] This is not to say that Northmarq will never be able to show that servicing fees were not contemplated by the parties' contract or that Kabani's reliance was otherwise unreasonable.  At this stage of the case, the Court is bound by the allegations in the counterclaim and the reasonable inferences in Plaintiff's favor.

[12] Northmarq argues it is not plausible that Northmarq authorized Campbell to communicate with Kabani on its behalf. (ECF No. 31 at 22.)  This argument, however, asks the Court to disregard a direct factual allegation made in the complaint, something the Court cannot do at this stage.  Instead, the Court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted).  Having done that, the Court then decides whether those presumedly true factual allegations are "enough to raise a right to relief above the speculative level . . . ." *Id.* at 555.

15

statements would be shared with Kabani." (ECF No. 31 at 22–23.) Kabani's response brief is not entirely clear. It does not mention the words agent or agency, nor does it cite any legal authorities. Kabani appears to argue that the alleged misstatements were made by Erxleban and Krueger (Northmarq's agents) and merely conveyed <u>via</u> the "conduit" that was Campbell, bypassing agency arguments all together. (ECF No. 37 at 17–19.) Kabani further argues that the facts pled make it "plausible that Northmarq authorized Campbell to share . . . the subject information with Kabani." (*Id.* at 19.)

Given the paucity of the briefing, the Court does not address any argument Kabani may be making that Northmarq is responsible for the statements even if Campbell was not acting as its agent. The Court finds that it is plausibly alleged that Campbell was Northmarq's agent for the limited purpose of conveying the information it gave him to provide to Kabani.

An agency relationship may be based on actual or apparent authority.[13] *Fid. & Deposit Co. v. Riess Fam., LLC*, No. 16-CV-270-GKF-FHM, 2018 WL 2088757, at \*6 (N.D. Okla. May 4, 2018). Actual authority results from a "principal's manifestation of consent *to the agent* that he is authorized to act on the principal's behalf and subject to his *control*." *Id.* (quoting *Thorton v. Ford Motor Co.*, 2013 OK CIV APP 7, ¶ 18, 297 P.3d 413, 419). An essential element of actual authority is whether the "principal has some degree of control over the conduct and activities of the agent." *McGee v. Alexander*, 2001 OK 78, ¶ 29, 37 P.3d 800, 807.[14] This requirement of control, however, is not all encom-

---

[13] Because the Court finds Kabani has plausibly pled a misstatement based on actual authority, it need not reach Northmarq's arguments regarding apparent authority.

[14] "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006) (Am. Law Inst. 2006).

passing, and "the content or specific meaning of the right [to control] varies." Restatement (Third) of Agency § 1.01 cmt. c. ("a person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment").[15] "The requirement that an agent be subject to the principal's control assumes that the principal is capable of providing instructions to the agent and of terminating the agent's authority." *Id.*

Here, Kabani has adequately alleged facts plausibly stating an agency relationship between Northmarq, as principal, and Campbell, as agent, for the purpose of sharing specific information. "Actual authority . . . is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf." Restatement (Third) of Agency § 3.01. Here, Kabani alleges that Northmarq authorized Campbell to provide the information to Kabani, anticipating that he would comply, and Campbell did, in fact, provide such information to Kabani as authorized.[16] (ECF No. 30 ¶¶ 28, 41.) Northmarq had the ability to provide instructions to Campbell and to terminate Campbell's authority before he transmitted the information.

Northmarq argues that "[n]o reasonable person would believe that Campbell was authorized to make statements on Northmarq's behalf" where Campbell worked for SJCO, and Northmarq was attempting to acquire SJCO. (ECF No. 31 at 22.) But, Kabani

---

[15] Oklahoma courts regularly cite the Restatement (Third) of Agency as authority on the common law of agency in Oklahoma. *See, e.g., Sur. Bail Bondsmen of Okla., Inc. v. Ins. Comm'r*, 2010 OK 73, ¶ 23, 243 P.3d 1177, 1185 (citing § 1.01 of the Restatement).

[16] "If the principal requests another to act on the principal's behalf, indicating that the action should be taken without further communication and the other consents so to act, an agency relationship exists. If the putative agent does the requested act, it is appropriate to infer that the action was taken as agent for the person who requested the action unless the putative agent manifests an intention to the contrary or the circumstances so indicate." Restatement (Third) of Agency § 1.01 cmt. c.

17

has alleged a factual pattern of conduct where both Kabani and Northmarq communicated to the other through Campbell on multiple occasions; on other occasions, Northmarq would respond directly to information Kabani had provided it via Campbell. (*E.g.,* ECF No. 30 ¶¶ 26–29, 32, 40–41.) It is not inherently incredible that Northmarq would choose to use Campbell as its agent for the limited purpose of an intermediary, particularly where the value of the company Northmarq was buying (and that SJCO was selling) might be increased by its ability to retain experienced contractors.

This is true even if Campbell was not otherwise able to bind Northmarq. "Agents who lack authority to bind their principals to contracts nevertheless often have authority to negotiate or to transmit or receive information on their behalf." Restatement (Third) of Agency § 1.01 cmt. c. So, for example, a "translator's relation to the principal is one of agency." *Id.* cmt. h. The scope of such an agency may be very narrow, but "despite the narrowness of its scope, an agency relation imposes legal consequences when the agent's acts are within its scope." *Id.*; *see also id.* ("Moreover, an agent may assume a pivotal role in the course of a transaction, a role that may commence with relaying information from one party to another but then encompass explanations and clarifications, all of which induce reliance by the recipient.").

Kabani has adequately alleged an agency relationship.

### C. Plaintiff Has Adequately Alleged an Independent Harm

Northmarq argues Kabani's fraud claims must be dismissed, because the alleged tort is insufficiently independent of the breach of contract. (ECF No. 31 at 23–24.) The undersigned disagrees.

Under Oklahoma law, a party cannot allege simultaneous breach of contract and fraud claims unless the two are "sufficiently distinct." *T.D. Williamson, Inc. v. Lincoln Elec. Auto. Inc.*, No. 21-cv-153-GKF-JFJ, 2022 WL 16842907, at *5 (N.D. Okla. Jan. 21,

18

2022); *see also Cont'l Res., Inc. v. Wolla Oilfield Servs. LLC*, No. 20-cv-00200, 2021 WL 2905412, *6 (W.D. Okla. July 9, 2021) (noting this is the "consensus view" among Oklahoma federal district courts). To be sufficiently distinct, a fraud claim must be based on different facts and must have resulted in different actual damages. *Key v. Exxon Mobil Corp.*, 508 F. Supp. 3d 1072, 1086 (E.D. Okla. 2020); *McGregor v. Nat'l Steak Processes, Inc.*, No. 11-CV-0570-CVE-TLW, 2012 WL 314059, at *3 (N.D. Okla. Feb. 1, 2012). Kabani can satisfy the different damages requirement if his allegations "could potentially support an award of extra-contractual damages." *Edwards v. Farmers Ins. Co.*, No. 08-CV-730-TCK-PJC, 2009 WL 4506218, at *5 (N.D. Okla. Nov. 24, 2009).

The facts of Kabani's fraud claims are sufficiently distinct from his breach of contract claim. Simultaneous fraud and breach of contract claims can be brought "where the formation of a contract is premised upon an intentionally deceptive promise to act." *T.D. Williamson*, 2022 WL 16842907, at *6 (citation and internal quotation marks omitted). This is precisely what Kabani alleges in his claim for fraudulent inducement.

Kabani's other fraud claims are similarly distinct, whether based on fraudulent representations or concealment. <u>All</u> depend on the contract <u>not</u> being interpreted in the way Kabani asserts in his contract claims.[17] Kabani is not merely alleging that Northmarq committed a tort by concealing its intention to breach the contract. *Cf. McGregor*, 2012 WL 314059, at *3. Kabani is alleging that, if the contract never provided for the payment of servicing fees, and Northmarq always knew this, then Northmarq committed fraud when it stated otherwise and concealed the necessity of different contract language.

---

[17] Northmarq's assertion that there is no "legitimate dispute regarding the existence, or enforceability, of the ICA" ignores the plain language of Kabani's counterclaims. (*Compare* ECF No. 38 at 9 *with, e.g.,* ECF No. 30 ¶ 132 ("To the extent that the amended Independent Contractors Agreement is an enforceable contract, Plaintiff breached that contract . . . .").)

Kabani makes similar allegations regarding the representations about working conditions. This is classic pleading in the alternative, and it is allowed at this stage of the litigation. Fed. R. Civ. P. 8(d).

### *Conclusion*

IT IS THEREFORE ORDERED that *Plaintiff's Motion to Dismiss Defendant's Amended Counterclaim* (ECF No. 31) is DENIED.

ORDERED this 14th day of March, 2025.

SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT